# United States District Court
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVID PHILLIPS, as Representative of the Estate of JACOBY JOSEPH STONEKING, Deceased, CARLA RENEE WILSON, and JACK STONEKING | § § § § § § | |
| | § | CASE NO. 3:18-CV-3382-S |
| v. | § § | |
| NEUTRON HOLDINGS, INC. d/b/a LIME and SEGWAY INC. | § § § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendant Neutron Holdings, Inc. d/b/a Lime's ("Lime") Motion to Compel Arbitration and for Stay or Dismissal [ECF No. 8]. For the following reasons, the Court grants the Motion.

### I. BACKGROUND

#### A. *The Lime App Interface*

Lime is a micro-mobility company that provides dockless bicycle and electric scooter ("e-scooter") rentals to metropolitan areas and universities around the world. Br. in Supp. Mot. to Compel Arbitration ("Br.") 1. To locate and unlock Lime's e-scooters, a user must first download the Lime App ("App") and create an account. *See id.* at 3-4. A user can create an account by either entering a telephone number or using a Facebook link to populate his or her information. *See id.* at 4. If a user enters a telephone number, he or she then clicks a button that says "NEXT." *See id.* If a user opts to sign up using Facebook, he or she clicks the button that says, "Continue with Facebook," which is located below the "NEXT" button. *See id.*; *see also* Def.'s App. 07. Underneath the Facebook button is a notice that states, "[b]y singing up, I confirm that I am at least 18 years old, and that I have read and agreed to Lime's **User Agreement & Terms of**

**Service.**" *See* Br. 4. The words "User Agreement" and "Terms of Service" are in darker boldface than the rest of the sentence, and they provide a hyperlink to Lime's User Agreement ("User Agreement"). *See id.*

### B. *The User Agreement*

If users click on the hyperlink, they are directed to a webpage containing the User Agreement. *See* Br. 5. The second full paragraph of the User Agreement is in all-caps and reads as follows:

> IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS AS FURTHER DETAILED IN SECTION 2 BELOW. BY AGREEING TO ARBITRATE, EACH PARTY IS GIVING UP ITS RIGHT TO GO TO COURT AND HAVE ANY DISPUTE HEARD BY A JUDGE OR JURY. BY AGREEDING TO WAIVE CLASS ACTION RIGHTS, EACH PARTY AGREES THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRSENTATIVE PROCEEDING OR AS AN ASSOCIATION.

Def.'s App. 09. Section 2 of the User Agreement is titled "ARBITRATION; CLASS ACTION WAIVER; DISPUTE RESOLUTION." *Id.* at 14. It reads, in relevant part, as follows:

> 2.1  <u>Dispute Resolution</u>:  Certain portions of this Section 2 are deemed to be a "written agreement to arbitrate" pursuant to the Federal Arbitration Act. You and Lime expressly agree and intend that this Section 2 satisfies the "writing" requirement of the Federal Arbitration Act. This Section 2 can only be amended by mutual agreement.
>
> \* \* \*
>
> 2.3  <u>Binding Arbitration</u>:  If We cannot resolve a Dispute as set forth in Section 2 (or agree to arbitration in writing with respect to an Excluded Dispute) within sixty (60) days of receipt of the notice, then ANY AND ALL DISPUTES ARISING BETWEEN YOU AND LIME (WHETHER BASED IN CONTRACT, LAW, STATUTE, RULE, REGULATION, ORDINANCE, TORT INCLUDING, BUT NOT LIMITED TO, FRAUD, ANY OTHER INTENTIONAL TORT OR NEGLIGENCE, COMMON LAW, CONSTITUTIONAL PROVISION, RESPONDEAT SUPERIOR, AGENCY AND/OR ANY OTHER LEGAL OR EQUITABLE THEORY), WHETHER ARISING BEFORE OR AFTER THE EFFECTIVE DATE OF THIS AGREEMENT, MUST BE RESOLVED BY

FINAL AND BINDING ARBITRATION. THIS INCLUDES ANY AND ALL DISPUTES BASED ON ANY PRODUCT, SERVICE OR ADVERTISING CONNECTED TO THE PROVISION OR USE OF THE SERVICES. The Federal Arbitration Act ("FAA"), not state law, shall govern the arbitrability of all disputes between Lime and You regarding this Agreement (and any Additional Terms) and the Services, including the "No Class Action Matters" Section below. BY AGREEING TO ARBITRATE, EACH PARTY IS GIVING UP ITS RIGHT TO GO TO COURT AND HAVE ANY DISPUTE HEARD BY A JUDGE OR JURY. Lime and You agree, however, that State or federal law shall apply to, and govern, as appropriate, any and all claims or causes of action, remedies, and damages arising between You and Lime regarding this Agreement and the Services, whether arising or stated in contract, statute, common law, or any other legal theory, without regard to State's choice of law principles.

2.4 Applicability of JAMS Rules and Location of Arbitration: A Dispute will be resolved solely by binding arbitration in accordance with the then-current Commercial Arbitration Rules of the Judicial Arbitration and Mediation Services Inc. ("JAMS") using JAMS' streamlined Arbitration Rules and Procedures, or by any other arbitration administrative service that You and an officer or legal representative of Lime consent to in writing.

*Id.* at 14-15. The applicable JAMS Rules allegedly incorporated into the User Agreement provide as follows:

Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

*Id.* at 57.

### C. *Using Lime*

Once the user completes the sign-up process, the App displays the locations of available bikes and e-scooters in the user's vicinity. *See* Br. 3. The user then selects his or her desired bike or e-scooter on the map, which prompts the App to display information about that ride, including price, battery level, mileage range, and directions to the desired ride. *See id.* Upon arrival at the bike or e-scooter, the user scans a QR code located on the bike or e-scooter using his or her

3

smartphone to unlock the bike or e-scooter and begin riding. *See id.* At the conclusion of the ride, the user parks the bike or e-scooter near a bike rack or another proper parking location. *See id.*

### D. *Stoneking Creates a Lime Account*

On July 4, 2018, Jacoby Joseph Stoneking ("Stoneking") signed up for Lime by entering his phone number and clicking the "NEXT" button. *See* Br. 2, 7; *see also* Resp. to Mot. to Compel Arbitration and for Stay or Dismissal ("Resp.") 12. Sometime thereafter, Stoneking fell while riding a Lime e-scooter in Dallas, Texas. *See* Br. 1; see also Compl. 4. He passed away the following day. *See id.*

Plaintiffs David Phillips, as Representative of the Estate of Jacoby Joseph Stoneking, Deceased, Carla Renee Wilson, and Jack Stoneking (collectively, "Plaintiffs") filed this action on December 21, 2018, asserting causes of action for design defect, manufacturing defect, marketing defect, breach of warranty of fitness for a particular purpose, and gross negligence—all based on the alleged e-scooter accident. *See* Compl. 4-6. Lime filed the pending Motion on March 2, 2019.

### II. ANALYSIS

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, written arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Here, the parties do not dispute the applicability of the FAA, which provides that a party seeking to enforce an arbitration provision may petition the court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* § 4.

Enforcement of an arbitration agreement involves two analytical steps. *See Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). The first is contract formation—whether the parties entered into any arbitration agreement at all. *Id.* The second involves contract interpretation to determine whether the claim at issue is covered by the arbitration agreement—

i.e., whether the claims are arbitrable. *Id.* Ordinarily, both steps are questions for the Court. *Id.* (citing *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). "But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).

### A. *Existence of a Valid Arbitration Agreement*

When a party seeks to compel arbitration based on a contract, courts must determine "whether there is a contract between the parties at all." *Arnold v. HomeAway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018) (citing *Kubala*, 830 F.3d at 201-02). "[I]t is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract." *Will-Drill Res.*, 352 F.3d at 218. The parties are silent on the issue of choice of law. "Nonetheless, both Plaintiff[s] and [Lime] cite Texas law, and, thus, the Court applies Texas law."[1] *Castaneda v. Swift Transp. Corp.*, No. EP-07-CA-369-DB, 2008 WL 1850652, at *2 (W.D. Tex. Apr. 25, 2008).

When a party seeks to compel arbitration based on a contract, the first question is whether there is a contract between the parties at all. *Arnold*, 890 F.3d at 550; *see also Kubala*, 830 F.3d at 201-02. Under Texas law, a binding contract requires: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds (mutual assent); (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding. *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018) (citation omitted); *see*

---

[1] Although unaddressed by the parties, the Court notes that the User Agreement contains a California choice-of-law provision. *See* Def.'s App. 38-39. However, as courts have recognized, "California contract law is substantially the same as Texas contract law." *Thomas v. Nat'l Collector's Mint, Inc.*, Civ. A. No. H-18-0348, 2018 WL 6329841, at *8 n.9 (S.D. Tex. Dec. 4, 2018) (citing *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 547 (W.D. Tex. 2017)). Therefore, the application of California law to the limited issue of whether Stoneking entered into an agreement that contained an arbitration agreement would not alter the analysis or result of this Memorandum Opinion and Order. *See May v. Expedia, Inc.*, No. A-16-CV-1211-RP, 2018 WL 4343445, at *2 n.3 (W.D. Tex. July 19, 2018) (declining to address a choice of law dispute when two states had similar laws).

*also USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). The parties dispute whether or not Stoneking assented to the Arbitration Policy.

### (1) *Nature of the Agreement*

Because Stoneking's assent is dependent on his usage of the App, the parties characterize the User Agreement as either a "clickwrap" agreement or a "browsewrap" agreement. *See* Resp. 5; Def.'s Reply in Support of Mot. to Compel. ("Reply") 3. In reality, it appears to be neither, but rather a hybrid of the two. Nevertheless, the caselaw on clickwrap and browsewrap agreements is relevant to the Court's analysis. Accordingly, the Court will briefly review the distinctions between the two types of agreements.

### a. *Clickwrap Agreements v. Browsewrap Agreements*

"A 'clickwrap agreement' allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the website," and "[i]f the consumer does not accept the terms of the agreement, the website will not complete the transaction." *Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.*, 106 F. Supp. 2d 895, 905 n.15 (N.D. Tex. 2000). Browsewrap agreements, by contrast, do not require an express manifestation of assent; rather, "[a] party . . . gives his [or her] assent simply by using the website." *See Sw. Airlines Co. v. BoardFirst, L.L.C.*, Civ. A. No. 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007)) (citing *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000)). A browsewrap agreement typically gives "notice on a website [that] conditions use of the site upon compliance with certain terms and conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Id.* (citations omitted).

Whereas courts routinely enforce clickwrap agreements, *see Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 781-83 (N.D. Tex. 2006) (collecting cases), "the validity of a browsewrap license turns on whether a website user has actual or constructive

6

knowledge of a site's terms and conditions prior to using the site." *Sw. Airlines*, 2007 WL 4823761, at *5. The same principles apply to downloading and using smartphone apps. *See Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1313 (W.D. Wash. 2018) ("When a user visits a website or downloads an app, they may be bound by the accompanying terms . . . through a 'clickwrap' agreement or a 'browsewrap' agreement." (citing *Nguyen v. Barnes & Nobel Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)).

### b. *Sign-in-wraps*

The User Agreement does not fit neatly into either category. Like most clickwrap agreements, Lime does not present users with an "accept" button or box. *See Sw. Airlines*, 2007 WL 4823761, at *4. But unlike browsewrap agreements, Lime requires users to affirmatively click either the "NEXT" or "Continue with Facebook" button after being presented with a link to the User Agreement. *See id.* Though the Fifth Circuit has not spoken on this issue, some courts have deemed this type of agreement to be a "sign-in-wrap." *See Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017) (citation omitted); *see also Colgate v. JUUL Labs, Inc.*, Case No. 18-cv-02499-WHO, 2019 WL 3997459, at *24 (N.D. Cal. Aug. 23, 2019) (citing *Selden v. Airbnb, Inc.*, No. 16-cv-00933, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016)). Sign-in-wraps are agreements that "notify the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise the user that he or she is agreeing to the terms of service when registering or signing up." *Meyer*, 868 F.3d at 75-76 (citing *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 386, 398 (E.D.N.Y. 2015)).

Here, in order to become a Lime user, individuals must first create an account by clicking either the "NEXT" button or the "Continue with Facebook" button on Lime's sign-up screen. *See* Br. 3-4, 11; Def.'s App. 03. Underneath those buttons, Lime advises users that by signing up, they confirm that they "have read and agreed to [the] User Agreement & Terms of Service." *See*

7

Br. 4, 11, Def.'s App. 07. Users are not required to click a separate "I agree" button. *See* Def.'s App. 07. The User Agreement, therefore, is best characterized as a sign-in-wrap.

### (2) *Reasonable Notice*

Courts typically enforce sign-in-wraps where the user had reasonable notice of the existence of the terms—i.e., whether the notice was "reasonably conspicuous."[2] *See Meyer*, 868 F.3d at 77. In making that determination, courts "consider the perspective of a reasonably prudent smartphone user." *Id.* A case out of the District Court for the District of Columbia—though not binding authority—is persuasive. *Selden*, 2016 WL 6476934, at *5. In that case, the court held that the defendant's mobile sign-up screen adequately placed the plaintiff on notice of the defendant's terms of service where the notice (1) contained hyperlinks to various agreements; (2) was "placed in roughly the middle of the page, in close proximity to all three sign-up buttons," (3) "appear[ed] in dark font, in sharp contrast to the white background," and (4) was "clearly legible." *Id.* at *2, 5. Moreover, though not in the sign-in-wrap context, the Western District of Texas has held that a user had sufficient notice of a website's arbitration policy where the "Terms and Conditions" and "Privacy Policy" were in blue, as opposed to black, font to indicate they were hyperlinks. *See Expedia*, 2018 WL 4343445, at *3.

Here, the Court finds that the hyperlink to the User Agreement on Lime's sign-up screen was reasonably conspicuous and placed Stoneking on notice of the User Agreement. The sign-up screen is visible on one page, and the hyperlink is "in close proximity" to the two sign-up buttons. *Selden*, 2016 WL 6476934, at *5; *see also* Reply 5-6. Moreover, the notice is legible, and the hyperlinked words **"User Agreement & Terms of Service"** are in dark, bold font, making them

---

[2] Plaintiffs ask the Court to apply the Uniform Commercial Code's ("UCC") definition of "conspicuous." Resp. 8. Plaintiffs have not identified, nor has the Court found, any binding authority that supports that request in the context of online-contract formation. The Court, therefore, declines to apply the UCC's definition of "conspicuous" to this analysis.

stand out from both the white screen and the surrounding gray text. *See Selden*, 2016 WL 6476934, at *5; *see also* Br. 4; Def.'s App. 07. Based on these circumstances, a "reasonably prudent smartphone user" would understand that by signing up for Lime, he or she is assenting to the User Agreement. *Meyer*, 868 F.3d at 77.

Accordingly, Stoneking manifested his assent to be bound by the User Agreement—which provides for arbitration—when he clicked the "NEXT" button after entering his phone number. *See Cubria*, 242 F. Supp. 3d at 548 (applying California law, user assented to Terms and Service when she inserted her phone number and clicked the "Next" and "DONE" buttons on the sign-up screen); *see also* Br. 11, Def.'s App 03. For the foregoing reasons, the Court finds that a valid agreement to arbitrate exists between Lime and Stoneking.

### B. *Arbitrability of the Claims*

The second step for the Court in considering a motion to compel arbitration is to determine whether the claim at issue falls within the scope of the arbitration agreement. *Kubala*, 830 F.3d at 201. But if the arbitration agreement "clearly and unmistakably" reserves arbitrability questions for the arbitrator, the analysis changes. *Howsam v. Dean Witter Reynolds, Inc.*, 587 U.S. 79, 83 (2002) (quoting *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). Such reservations, known as "delegation clauses," are enforceable and transfer the Court's power to decide arbitrability questions to the arbitrator. *Kubala*, 830 F.3d at 201-02; *see also Henry Schein*, 139 S. Ct. at 529. In determining whether an arbitration agreement "clearly and unmistakably" reserves arbitrability questions for the arbitrator, courts ask this question: "Did the parties agree to submit the arbitrability question itself to arbitration?" *House Ref., L.P. v. United*

*Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 423 (5th Cir. 2014) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995)).

The Fifth Circuit has held that, generally, stipulating that arbitration rules will govern the arbitration of disputes constitutes such "clear and unmistakable" evidence. *See Petrofac, Inc. v. Dyn-McDermott Petroleum Operations Co.*, 687 F.3d 671, 674-75 (5th Cir. 2012) (addressing incorporation of the Commercial Arbitration Rules of the American Arbitration Association); *cf. Cooper v. WestEnd Capital Mgmt.*, 832 F.3d 534, 546 (5th Cir. 2016) (arbitrator properly determined issues of arbitrability where the relevant agreement expressly incorporated the Judicial Arbitration and Mediation Services Inc.'s ("JAMS") rules).

Here, the User Agreement incorporates the JAMS rules as follows:

> 2.4   Applicability of JAMS Rules and Location of Arbitration: A Dispute will be resolved solely by binding arbitration in accordance with the then-current Commercial Arbitration Rules of the Judicial Arbitration and Mediation Services Inc. ("JAMS") using JAMS' streamlined Arbitration Rules and Procedures, or by any other arbitration administrative service that You and an officer or legal representative of Lime consent to in writing.

Def.'s App. 14-15. "Then-current" refers to the JAMS Rules that are effective sixty days after a claimant sends Lime a written notice of a claim. *See* Br. 13; Def.'s App. 15. The current JAMS Rules have been effective since 2014, so they govern this dispute. Br. 14; *see also* Def.'s App. 46. The current JAMS rules read, in relevant part, as follows:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation, or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

Def.'s App. 57. The Court finds that this incorporation is clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability and scope to the arbitrator. *See Petrofac*,

687 F.3d at 674-75. Therefore, it is for the arbitrator, and not the Court, to decide threshold questions, including the scope of the arbitration.

### III. CONCLUSION

For the reasons discussed above, the Court grants Lime's Motion to Compel Arbitration and for Stay or Dismissal. The Court finds that an agreement, including an arbitration provision, exists between Lime and Stoneking. The arbitration provision incorporates the JAMS Rules, evincing clear and unmistakable evidence of the parties' intent to have the arbitrator decide whether a given claim must be arbitrated. Any challenges to the enforceability or scope of the Arbitration Provision must be decided by the arbitrator. This action is dismissed, without prejudice, in favor of arbitration. *See Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (dismissal proper where all issues raised in district court must be submitted to arbitration).

**SO ORDERED.**

SIGNED October 2, 2019.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**